# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Myron Smith,                              File No. 11-cv-273 (PJS/TNL)

      Plaintiff/Counter Defendant,

v.                                        **ORDER OPINION**

Genetic Depot, Inc.,

      Defendant/Cross Defendant,

Genesus, Inc.,

      Defendant/Counterclaimant/Cross
      Claimant.

---

John S. Beckmann and Cameron D. Davis, Hoversten, Johnson, Beckman & Hovey, LLP, 807 West Oakland Avenue, Austin, MN 55912 (for Plaintiff/Counter Defendant);

Hilary R. Stonelake and Robert G. Benner, Dunlap & Seeger, PA, P.O. Box 549, Rochester, MN 55903-0549 (for Defendant/Cross Defendant); and

Brian J. Donahoe, Cutler & Donahoe, 100 Phillips Avenue North, Ninth Floor, Sioux Falls, SD, 57104, and Darin S. Wieneke, Kathleen K. Curtis, and Keith J. Kerfeld, Tewksbury & Kerfeld, P.A., 88 South Tenth Street, Suite 300, Minneapolis, MN 55403 (for Defendant/Counterclaimant/Cross Claimant).

---

This matter comes before the Court, United States Magistrate Judge Tony N. Leung, on Plaintiff Myron Smith's ("Smith") Motion for Leave to Amend Complaint (Docket No. 38). At the hearing, Cameron D. Davis appeared on behalf of Smith and Kathleen K. Curtis appeared on behalf of Defendant/Counterclaimant/Cross Claimant Genesus, Inc. ("Genesus").

# I.

## A. Factual Background

By First Amended Complaint, Smith brings claims for breach of contract, express warranty, implied warranty of merchantability, and implied warranty of fitness for a particular purpose as well as strict liability and negligence against Genesus and Defendant/Cross Defendant Genetic Depot, Inc. ("Genetic Depot") in connection with a breakout of disease at one of Smith's hog-farming operations. (First Am. Compl., ¶¶ XXI-LI, Docket No. 1-2.)

Smith entered into a farrowing arrangement with Genesus, in which Smith would purchase breeding gilts[1] and boar semen from Genesus and raise hogs. (First Am. Compl., ¶ X; Mem. of Points & Authorities at 1, Docket No. 40.) As part of the arrangement, Genesus would then sell the gilts produced by Smith to other Genesus customers. (Mem. of Points & Authorities at 1.) Ernie Halbach, Genesus's regional sales and service representative, represented Genesus in the transaction with Smith. (Mem. of Points & Authorities at 1, 3; Smith Aff., ¶¶ 4-5, Docket No. 41; Multiplication Agreement at 6, Docket No. 4-1.)

Genetic Depot supplies boar semen. (First Am. Compl., ¶ V.) Genetic Depot advertises that its boar semen is "PRRS naïve," which means "that none of [its] boars have been exposed to, nor has the boar semen operational facility been infected with the

---

[1] A gilt is a female hog that has not yet been bred. *Hogs & Pork: Background*, United States Dep't of Agricul., http://www.ers.usda.gov/topics/animal-products/hogs-pork/background.aspx (last visited February 13, 2013).

[porcine reproductive and respiratory syndrome ('PRRS')] virus."[2]  (First Am. Compl, ¶ VII.)  Genesus purchased boar semen from Genetic Depot and directed Smith to inseminate his sows with boar semen from Genetic Depot.  (First Am. Compl., ¶¶ IX-X; Mem. of Points & Authorities at 2.)

In May 2009, Genetic Depot shipped a batch of boar semen to Smith's farm for breeding purposes.  (First Am. Compl., ¶ VIII; Mem. of Points & Authorities at 2.) Shortly after Smith's hogs were inseminated, Smith was notified that the batch of semen was potentially contaminated with PRRS.  (Mem. of Points & Authorities at 2.)  Blood samples taken of Smith's herd tested positive for the PRRS virus and the virus strain was identical to the one found in Genetic Depot's boar semen.  (First Am. Compl., ¶ XIV.) As a result of the PRRS infection, Smith's breeding stock was "depopulated," leading to substantial financial losses for Smith.  (First Am. Compl., ¶ XV-XVII.)

Smith asserts that Genesus and Genetic Depot are both liable for the PRRS outbreak.  As part of this litigation, Smith consulted with an expert who "indicated that the failure rate for breeding operations is extremely high" and "PRRS outbreaks are a leading risk factor for breeding stock operations."  (Mem. of Points & Authorities at 3.)

### B.  Motion to Amend

With respect to the instant motion, Smith seeks to leave to amend the First Amended Complaint both administratively and substantively by (1) changing all references to Keystone Pigs of America and "KPA" to Genesus to reflect a name change

---

[2] "PRRS causes both late-term reproductive failure and postweaning respiratory disease in swine."  *PRRS Seroprevalence on U.S. Swine Operations*, Animal and Plant Health Inspection Service, United States Dep't of Agricul., http://www.aphis.usda.gov/animal_health/nahms/swine/downloads/swine2006/Swine2006_is_PRRS.pdf (last visited February 13, 2013).

that occurred in 2007, (Mem. of Points & Authorities at 5; Joint Stipulation at 1, Docket No. 8); incorporating additional factual allegations, (Mem. of Points & Authorities at 5); and (3) adding claims for breach of contract with respect to Genesus and negligent and/or fraudulent misrepresentation based on Halbach's representations, (Mem. of Points & Authorities at 5). Genesus does not object to editing references to Genesus's prior entity, but objects to the additional claims as futile. (*See* Mem. of Law in Opp'n, Docket No. 46.) Genesus has taken no position on the additional factual allegations. Genetic Depot filed a letter with the Court stating that it joined in Genesus's opposition of Smith's proposed amendments. (Letter, Docket No. 49.)

## II.

### A. Standard of Review

With the exception of amendments as a matter of course, the Federal Rules of Civil Procedure permit a party to "amend its pleadings only with the opposing party's written consent or the court's leave."[3] Fed. R. Civ. P. 15(a)(2). The Rules further provide that leave shall be freely given "when justice so requires." *Id.* "However, there is no absolute right to amend and a finding of undue delay, bad faith, or dilatory motive, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the non-moving party, or futility of the amendment may be grounds to deny a motion to amend." *Doe v. Cassel*, 403 F.3d 986, 990-91 (8th Cir. 2005) (quotation omitted). "The decision whether to grant leave to amend rests in the discretion of the trial court."

---

[3] It is not disputed that the deadline for motions to amend was May 15, 2012. (Second Am. Pretrial Scheduling Ord., ¶ 2, Docket No. 37.) However, because the parties were exploring whether Genesus would be willing to stipulate to the amendments, Genesus does not oppose Smith's motion on grounds of untimeliness. (Mem. of Law in Opp'n at 5 n.4.)

*Hanson v. M & I Marshall & Isley Bank*, No. 10-cv-2069 (JRT/JJK), 737 F. Supp. 2d 988, 990 (D. Minn. Sept. 15, 2010).

An "[a]mendment is futile where the proposed amended complaint fails to state a claim under the analysis for a Rule 12(b)(6) motion." *Block v. Toyota Motor Corp.*, File Nos. 10-cv-2802 (ADM/AJB), 10-cv-2803 (ADM/AJB), 10-cv-2804 (ADM/AJB), 10-cv-2805 (ADM/AJB), 795 F. Supp. 2d 880, 886 (D. Minn. June 13, 2011); *see also Hintz v. JP Morgan Chase Bank, N.A.*, 668 F.3d 505, 511 (8th Cir. 2012) ("When the court denies leave on the basis of futility, it means the district court has reached the legal conclusion that the amended complaint could not withstand a motion to dismiss under Rule 12(b)(6) . . . ." (quotation omitted)).

> In ruling on a Rule 12(b)(6) motion, a court must accept as true all of the factual allegations in the complaint and draw all reasonable inferences in the plaintiff's favor. Although the factual allegations in the complaint need not be pleaded in great detail, they must be sufficient to raise a right to relief above the speculative level.

*DeVary v. Countrywide Home Loans, Inc.*, No. 09-cv-1146 (PJS/FLN), 701 F. Supp.2d 1096, 1101 (quotation and citations omitted). "'Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.'" *U.S. ex rel Raynor v. Nat'l Rural Utils. Co-op. Fin., Corp.*, 690 F. 3d 951, 955 (8th Cir. 2012) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

## B. Updated References and Additional Factual Allegations

Given that there is no opposition to Smith's request for leave to update the references to Keystone Pigs of America and KPA and add additional factual allegations, Smith's motion for leave to amend is granted in part with respect to these two areas.

## C. Breach-of-Contract Claim

Neither party disputes entering into the Multiplication Agreement. (*See* Mem. of Law in Opp'n at 7 ("Plaintiff's agreement with Genesus . . . was governed by the Multiplication Agreement dated June 6, 2007.")). Indeed, Smith's proposed Second Amended Complaint states: "Ernie Halbach acting on behalf of [Genesus] entered into a contract with Myron Smith providing that Plaintiff be paid certain profits arising from Smith's investment in a multiplier herd hog production agreement. *A copy of that agreement is here attached as Exhibit A*." (Redlined Proposed Second Amended Compl., ¶ 52 (emphasis added), Docket No. 45-2.) Exhibit A is the June 6, 2007 Multiplication Agreement. (Multiplication Agreement at 1, Docket No. 45-1.)

Smith's proposed Second Amended Complaint then alleges as follows:

> 53. *As part of [Genesus's] proposal to Plaintiff*, [Genesus] provided to Plaintiff a forecast of expected profits. This forecast was provided to both Plaintiff and his financier, AgStar, for the express purpose of allowing Plaintiff to obtain financing to the [Genesus] business proposal. In this forecast, [Genesus] promised Smith the capacity to realize profits of $130,000 to $170,000 in excess of normal market hog profit operations as a result of the [Genesus] multiplier arrangement. A true and accurate copy of the [Genesus] forecasts with respect to future profits are attached hereto as **Exhibit B**.

54.     In reliance on contractual terms identifying future profits, Plaintiff invested proceeds exceeding $660,000 in the multiplier herd hog production agreement.

55.     *[Genesus] has breached its agreement with Myron Smith by failing to provide Smith profits in excess of the market hog industry as promised in the attached* **Exhibit B**.

56.     *As a direct breach of [Genesus's] wrongful breach of its contract with Myron Smith*, [P]laintiff has sustained damages as alleged elsewhere in this Complaint.

(Redlined Proposed Second Amended Compl., ¶¶ 53-56 (emphasis added).)

The Multiplication Agreement—again, which neither party disputes entering into—provides, among other things:

24.     *Neither [Genesus] nor the Multiplier shall, by reason of the termination or nonrenewal of this Agreement, be liable to the other for compensation, reimbursement or damage on account of the loss of prospective profits or anticipated sales*, or on account of expenditures, investments, lease or commitments in connection with the business or goodwill of [Genesus] or the Multiplier or otherwise.

. . .

30.     *This Agreement supersedes and cancels all prior written or oral agreements between the parties hereto.* The invalidity of any particular provision of the Agreement shall not affect any other provision hereof and the Agreement shall be construed as if such invalid provision were omitted.  This Agreement contains the entire agreement between the parties hereto.

(Multiplication Agreement, ¶¶ 24, 30 (emphasis added).)

Genesus contends that Paragraphs 24 and 30 bar Smith from bringing the proposed breach-of-contract claim and, therefore, such claim is futile.  (Mem. of Law in Opp'n, at

7.)  Genesus also argues that claim is futile because Smith has not articulated how Genesus breached the contract, namely, which profits Genesus purportedly failed to pay, and the forecast was not definitive enough to constitute a contract.  (Mem. of Law in Opp'n at 7, 8.)

Significantly, the Multiplication Agreement also provides that "[t]his Agreement shall be governed by the laws of the Province of Manitoba, Canada."  (Multiplication Agreement, ¶ 31.)

### 1.  Applicability of the Multiplication Agreement

The Court begins with the applicability of the Multiplication Agreement to the proposed breach-of-contract claim.  Curiously, Smith "asserts that the *Multipli[cation] Agreement does not have any bearing on the issues in dispute in the instant matter, and should not, in any fashion be applied into this litigation*."  (Pl.'s Supp. Br. at 1 (emphasis added), Docket No. 55.)  Smith maintains that "the Agreement must be scrutinized for any language regarding transactions that are implicated in the Complaint"; "[t]he primary transaction that is at issue in this matter is the sale of semen from [Genesus] to Smith, and Smith's use of that semen in an artificial insemination process"; there is hardly any reference to semen or artificial insemination other than to state "that semen 'must be purchased from a board stud approved by [Genesus] and must be of genetic lines suitable for producing marketable off-spring'"; and, therefore,

> [g]iven the lack of discussion of semen purchase in the Multiplication Agreement, *it is clear that this Agreement is not applicable to the resolution of the dispute between Smith and Genesus regarding semen sales, and should not be referenced in resolving any disputes related to*

> KPA/Genesus's numerous alleged failures relating to the
> supply of infected semen to Smith's operation.

(Pl.'s Supp. Br. at 2, 2-3 (emphasis added).)  Smith concludes that, "*[b]ecause the issues involved in the instant litigation are beyond the relationship contemplated in the Multipli[cation] Agreement*, Smith asserts *that no clause contained therein*, including the choice[-]of[-]law clause, *should be applied by the Court in resolving this dispute*."  (Pl.'s Supp. Br. at 4 (emphasis added).)

The Court cannot make sense of Smith's argument.  Smith seeks to amend his complaint to add a breach-of-contract claim based on the Multiplication Agreement, i.e., the contract the parties entered into, yet argues that the allegedly breached contract has no bearing on the claim.  *Smith's proposed Second Amended Complaint identifies the Multiplication Agreement as the underlying contract.*  (Redlined Proposed Second Amended Compl., ¶ 52.)  The Multiplication Agreement plainly bears on Smith's proposed breach-of-contract claim.  Smith's argument is without merit.

## 2.  Choice of Law

As stated above, the Multiplication Agreement provides that "[t]his Agreement shall be governed by the laws of the Province of Manitoba, Canada."  (Multiplication Agreement, ¶ 31.)  On October 16, this Court ordered additional briefing on whether, and to what extent, the laws of the Province of Manitoba, Canada, apply to this Court's analysis of Smith's proposed breach-of-contract claim since neither party had addressed this issued when briefing the motion to amend.  Following this supplemental briefing, Smith contends that Minnesota law should govern his proposed breach-of-contract claim

whereas Genesus asserts that Manitoba law governs. Because Genesus objects to Smith's proposed breach-of-contract claim on the basis of futility, it is first necessary to determine the applicable substantive law to Smith's proposed claim.

Minnesota courts typically enforce choice-of-law provisions. *See Schwan's Sales Enterprises, Inc. v. SIG Pack, Inc.*, 476 F.3d 594, 596 (8th Cir. 2007) ("Minnesota courts are 'committed to the rule that parties may agree that the law of another state shall govern their agreement and will interpret and apply the law of another state where such an agreement is made.' (quoting *Milliken & Co. v. Eagle Packaging Co.*, 295 N.W.2d 377, 380 n. 1 (Minn.1980))); *Hagstrom v. Am. Circuit Breaker Corp.*, 518 N.W.2d 46, 48 (Minn. App. 1994) ("Minnesota traditionally enforces parties' contractual choice of law provisions."). Such provisions are likewise enforced by Canadian courts. *See Humble v. MacKay*, 2012 BCSC 1285, para. 12 ("Where parties to a contract have expressly indicated that a particular law will govern the contract, the general rule is that the courts will respect the parties' choice provided the choice is (1) *bona fide*, (2) legal, and (3) there are no public policy grounds for which the chosen law should not be applied." (citing *Vita Food Prods. Inc. v. Unus Shippin Co.*, [1939] 2 D.L.R. 1, [1939] 1 All E.R. 513 (Nova Scotia P.C.) as leading case)).

### a. Whether Conflict Exists Between the Laws of Minnesota & Manitoba

"A district court sitting in diversity applies the law, including the choice-of-law rules, of the state in which it sits. Before applying the forum state's choice-of-law rules, however, a trial court must first determine whether a conflict exists." *Prudential Ins. Co.*

*of Am. v. Kamrath*, 475 F.3d 920, 924 (8th Cir. 2007) (citation omitted). "An actual conflict exists if choosing the rule of one state or the other is outcome determinative." *Nodak Mut. Ins. Co. v. Am. Family Mut. Ins. Co.*, 590 N.W.2d 670, 672 (Minn. App. 1999).

### i. Contract Interpretation Generally

Under Minnesota law, courts "review the language of a contract to determine the intent of the parties [and, w]hen the language of a contract is clear and unambiguous, [courts] enforce  the agreement of the parties as expressed in the contract." *Caldas v. Affordable Granite & Stone, Inc.*, 820 N.W.2d 826, 832 (Minn. 2012) (citation omitted). Whether a contract is ambiguous is a question of law. *Thomsen v. Famous Dave's of America, Inc.*, 606 F.3d 905, 908 (8th Cir. 2010). "A contract is ambiguous if, based upon its language alone, it is reasonably susceptible of more than one interpretation." *Id.* (quotation omitted).

Canadian law contains similar tenets:

> The cardinal principal of contract interpretation is that the court should give effect to the intentions of the parties as expressed in their written document. If the contract is clear and unambiguous, the contract itself should be all that is required to determine the parties' intentions. That is, it will not be necessary to consider extrinsic evidence to assist in interpreting the contract.

*Geoffrey L. Moore Realty Inc. v. Manitoba Motor League*, 2003 MBCA 71, para. 11 (quotation omitted) (*GLMR*); *see also Eli Lilly & Co. v. Novopharm Ltd.*, 1998 SCC 59, para. 54 ("The contractual intent of the parties is to be determined by reference to the words they used in drafting the document, possibly read in light of the surrounding

circumstances which were prevalent at the time. Evidence of one party's subjective intention has no independent place in this determination."). Ambiguity exists if a contractual provision "is reasonably susceptible of more than one meaning." *GLMR*, 2003 MBCA 71, para. 25 (quotation omitted).

### ii. Inclusion of the Proposal/Forecast Document as a Term of the Contract

Smith's proposed breach-of-contract claim first requires the proposal/forecast document, referenced in Paragraphs 53 and 55 of the proposed Second Amended Complaint, be a term of the contract. The proposal is dated May 29, 2007, and appears to be a series of comparison scenarios examining "farrow-to-finish" profitability between multiplication and commercial hog operations. (Proposal, Docket No. 45-1.)

The Multiplication Agreement is dated June 6, 2007. (Multiplication Agreement at 1.) Paragraph 17 of the Multiplication Agreement states that Smith (the multiplier) will be paid pursuant to a schedule attached to the contract. (Multiplication Agreement ¶ 17.) Schedule B provides the rates that the multiplier will be paid for gilts "produced by the multiplier and selected and sold by [Genesus]."[4] (Schedule B, Docket No. 45-1.) Paragraph 17 conditions payment to the multiplier, not surprisingly, on the sale of a gilt to a commercial producer: "[Genesus] shall pay to the Multiplier *in respect of each sale to the commercial producer* of a Parent gilt of breeding stock purchased by the Multiplier in accordance with the terms hereof . . . ." (Multiplication Agreement ¶ 17 (emphasis

---

[4] Paragraph 17 of the Multiplication Agreement actually refers to Schedules C and D. (Multiplication Agreement ¶ 17.) Upon inspection, however, it is unambiguous that Schedule B contains the rates the multiplier will be paid for gilts, Schedule C lists the prices of animals for Smith to stock the farm, and Schedule D describes an additional discount provision for stocking the farm. (Schedules B, C, D, Docket No. 45-1.)

added).)  Thus, pursuant to the plain language of the parties' contract, a sale must occur

before Genesus is obligated to pay Smith.  Finally, Paragraph 30 of the Multiplication

Agreement contains a merger clause, stating that the Multiplication Agreement

"supersedes and cancels all prior *written* or oral agreements between the parties" and

"contains the entire agreement of the parties."  (Multiplication Agreement ¶ 30 (emphasis

added).)

The heart of Smith's proposed breach-of-contract claim is that he was guaranteed

profits under the proposal.  The plain language of the subsequent Multiplication

Agreement, however, sets out the formula by which Smith will be paid per gilt sale.

Smith is essentially attempting to use the "prior" proposal to vary the language of the

later executed contract—a contract which expressly replaced all prior written agreements.

Under Minnesota law,

> [t]he parol evidence rule prohibits the admission of extrinsic
> evidence of prior or contemporaneous oral agreements, *or
> prior written agreements*, to explain the meaning of a contract
> when the parties have reduced their agreement to an
> *unambiguous integrated writing*.  Accordingly, when parties
> reduce their agreement to writing, parol evidence is ordinarily
> inadmissible to vary, contradict, or alter the written
> agreement.

*Alpha Real Estate Co. of Rochester v. Delta Dental Plan of Minn.*, 664 N.W.2d 303, 312

(Minn. 2003).  Because the Multiplication Agreement is an integrated document, Smith

cannot use the prior proposal to vary the terms of the Multiplication Agreement.

Under Canadian law, merger clauses are known as "entire agreement clauses . . . ,

provisions that state the written contract embodies the whole agreement between the

parties and excludes all representations, agreements, etc. made outside of the written document." *TRC Enters. v. Tobmar Newstands, Inc.*, 2010 MBQB 112, para. 181. In *TRC Enters.*, the Manitoba Court of Queen's Bench commented on the enigmatic nature of this area of law, noting "there appears to be no overarching theory of how the courts should approach such provisions." *Id.* (citing Geoff R. Hall, *Canadian Contractual Interpretation Law* 232 (2007)); *see* Hall, *Canadian Contractual Interpretation Law* 232 (noting "it is difficult to predict in any particular case whether an entire agreement clause will be enforced or not"); *cf. Raabe v. 4042492 Manitoba Ltd.*, 2011 MBQB 234, para.47 (describing factors for evaluating such clauses as set forth in *Tercon Contractors Ltd. v. British Columbia (Transportation & Highways)*, 2010 1 SCC 4). According to Hall:

> To the extent that there is a consistent theme to the various concepts which seem to be at play, it appears to be that entire agreement clauses will only be enforced against a party who understood (or ought to have understood) the effect of the clause and whose attention was specifically drawn to the provision.

*Canadian Contractual Interpretation Law* 233. Given the uncertainty as to the enforceability of the Multiplication Agreement's "entire agreement"/merger clause under Canadian law, this Court will assume, for purposes of this motion only, that the proposal is not necessarily excluded as a result of the "entire agreement"/merger clause.

Nonetheless, Canadian law provides that "[a]s a general rule, extrinsic evidence will not be admitted to vary, add to, subtract from or qualify the parties' written agreement if the language of the contract is clear and unambiguous." *Pine Ridge Golf Club v. Lombard Gen. Ins. Co. of Can.*, 2003 MBQB, para. 29; *see also Eli Lilly & Co.*,

1998 SCC 59, para. 55 ("Indeed, it is unnecessary to consider any extrinsic evidence at all when the document is clear and unambiguous on its face."); *Dinney v. Great-West Life Assurance Co.*, 2009 MBCA 29, para. 59 ("Extrinsic evidence is not admissible if the language of the written contract is clear and unambiguous."). This extrinsic evidence includes "negotiations leading to the final contract." *GLMR*, 2003 MBCA 71, para. 19.

As stated above, the plain language of the parties' contract requires a sale to occur before Genesus is obligated to pay Smith. Schedule B then sets the rates Genesus will pay depending on the type of gilt sold. Pursuant to Canadian law, Smith cannot now use the proposal to claim that he was guaranteed certain profits despite not having sold any gilts when the Multiplication Agreement expressly conditions payment on such sales. (*See* Multiplication Agreement, ¶ 17.) Indeed, the proposal itself is premised upon *sales* of gilts. (Smith Farms Gilt Multiplication Proposal lns. 22-23 (listing figures based on anticipated *gilt sales*), Docket No. 40-1 at 26-31.) There are no allegations that Smith has not been paid for any gilts sold.

In sum, the Multiplication Agreement unambiguously sets forth the conditions upon the occurrence of which Smith will be paid. Therefore, under either Minnesota or Canadian law, Smith's breach-of-contract claim based on the proposal fails because each jurisdiction prohibits the use of extrinsic evidence (the proposal) to vary the unambiguous terms of the contract (the Multiplication Agreement).

### D. Negligent & Fraudulent Misrepresentation Claim

With respect to Smith's proposed negligent and fraudulent misrepresentation claim, Genesus argues that Smith has not pleaded his claims with the requisite particularity and that, under either theory, Smith's claims fail as a matter of law.

#### 1. Governing Law

"[A] choice of law provision in a contract will govern non-contract claims if those claims are 'closely related to the interpretation of the contract[] and fall within the ambit of the express agreement' that the contract will be interpreted under the laws of a particular state." *Fla. State Bd. of Admin. v. Law Eng'g & Envtl. Servs., Inc.*, No. 02-cv-4283 (DSD/FLN), 262 F. Supp. 2d 1004, 1013 (D. Minn. 2003) (quoting *Nw. Airlines, Inc. v. Astraea Aviation Servs., Inc.*, 111 F.3d 1386, 1392 (8th Cir. 1997)); *see also Holden Farms, Inc. v. Hog Slat, Inc.*, 347 F.3d 1055, 1061 (8th Cir. 2003) ("The essential principle of *Northwest Airlines* is that, under Minnesota law, if analysis of the claims connected to a contract involves interpretation of the contract, then the forum will apply the contractual choice-of-law provisions to the tort claims."). A tort claim is closely related to the terms of the contract when "the [c]ourt would need to interpret the contract in order to resolve the tort claim." *Warren E. Johnson Cos. v. Unified Brand, Inc.*, No. 10-cv-196 (MJD/RLE), 735 F. Supp. 2d 1099, 1105 (D. Minn. 2010); s*ee also Holden Farms, Inc.*, 347 F.3d at 1061.

The choice-of-law provision in this case is a narrow one, providing that "[t]his Agreement shall be governed by the laws of the Province of Manitoba, Canada." (Multiplication Agreement, ¶ 31.) *See Fla. State Bd. of Admin.*, 262 F. Supp.2d at 1012,

1013 ("governed by" language signals narrow choice-of-law provision). Claims of misrepresentation which relate to *contract performance* have been deemed closely related to the interpretation of the contract and, consequently, within the ambit of a narrow choice-of-law provision. *Id.* at 1014-15; *see, e.g.*, *Holden Farms, Inc.*, 347 F. 3d at 1061 (negligent misrepresentation claim was closely related to contract where claim required "an analysis of whether the contract included [the alleged] warranties and of what the warranties meant"); *Nw. Airlines, Inc.*, 111 F.3d at 1392 (misrepresentation claim closely related to contracts as claim stemmed from an alleged failure to perform under the contracts); *Fl. State Bd. of Admin.*, 262 F. Supp.2d at 1014 (negligent misrepresentation claim that report did not accurately reflect condition of building was closely related to breach of contract claim for preparation of the report).

Here, Smith's negligent and fraudulent misrepresentation claims do not relate to the performance of the Multiplication Agreement, but the circumstances of formation of that Agreement. Smith seeks leave to allege that Genesus (through Halbach) failed to make certain disclosures, misrepresented Genesus's expertise, misled Smith concerning future profits, and misrepresented the competence of Genetic Depot—*all of which induced Smith to enter into* the Multiplication Agreement. (Redlined Proposed Second Amended Compl., ¶¶ 62-63). Tort claims based on the circumstances of formation fall outside the parties' narrow choice-of-law provision and, therefore, this Court applies Minnesota law in its analysis of Smith's proposed negligent and fraudulent misrepresentation claims. *See Fla. State Bd. of Admin.*, 262 F. Supp. 2d at 1015.

## 2. Particularity

"Under Minnesota law, any allegation of misrepresentation, whether labeled as a claim of fraudulent misrepresentation or negligent misrepresentation is considered an allegation of fraud which must be pled with particularity." *Trooien v. Mansour*, 608 F.3d 1020, 1028 (8th Cir. 2010); *see* Fed. R. Civ. P. 9(b) ("In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake.").

> To satisfy the rule, a plaintiff must plead "such matters as the time, place and contents of false representations, as well as the identity of the person making the misrepresentation and what was obtained or given up thereby." *Abels v. Farmers Commodities Corp.*, 259 F.3d 910, 920 (8th Cir. 2001) (internal quotation marks omitted). While the level of particularity required depends on the nature of the case, the plaintiff "must typically identify the who, what, where, when, and how of the alleged fraud." *BJC Health Sys. v. Columbia Cas. Co.*, 478 F.3d 908, 917 (8th Cir. 2007) (internal quotation marks omitted). The purpose of the particularity requirement is to allow defendants to respond specifically and quickly to damaging fraud allegations. *United States ex rel. Costner v. United States*, 317 F.3d 883, 888 (8th Cir. 2003) (citation omitted).

*Petsche v. EMC Mortg. Corp.*, No. 10-cv-4750 (JRT/TNL), 830 F. Supp. 2d 663, 673-74 (D. Minn. 2011). "In other words, a plaintiff must plead the time, place and contents of the false representations, the identity of the individual who made the representations and what was obtained thereby." *Cox v. Mortg. Elec. Registration Sys., Inc.*, No. 10-4626 (DSD/SER), 794 F. Supp.2d 1060, 1066 (D. Minn. 2011) (quotation omitted).

Because this Court concludes that Smith's proposed misrepresentation claims fail as a matter of law, as will be explained further below, the Court assumes for purposes of

this motion that Smith's claims were pleaded with sufficient particularity with one exception. In Paragraph 62 of Smith's proposed Second Amended Complaint, Smith alleges that the misrepresentations at issue "include, *but are not limited to*, the following" and then proceeds to list the five misrepresentations purportedly made by Halbach. (Emphasis added.) To the extent Smith intends to assert that Genesus is liable for misrepresentations which are not included in the list set forth in the proposed Second Amended Complaint, such claims have not been pleaded with sufficient particularity and any misrepresentation claims by Smith are limited only to those misrepresentations identified therein.

### 3. Misrepresentation Claims

To succeed in a fraudulent misrepresentation claim under Minnesota law, a plaintiff must prove:

> (1) there was a false representation by a party of a past or existing material fact susceptible of knowledge; (2) made with knowledge of the falsity of the representation or made as of the party's own knowledge without knowing whether it was true or false; (3) with the intention to induce another to act in reliance thereon; (4) that the representation caused the other party to act in reliance thereon; and (5) that the party suffer[ed] pecuniary damage as a result of the reliance.

*Trooien*, 608 F.3d at 1028 (quoting *Hoyt Props., Inc. v. Prod. Res. Group, LLC*, 736 N.W.2d 313, 318 (Minn. 2007)). The elements of fraudulent and negligent misrepresentation differ only with respect to the scienter requirement. *Id.* "In a negligent misrepresentation claim, a plaintiff must show that the defendant supplied false

information for the guidance of others in their business transactions and in doing so fail[ed] to exercise reasonable care or competence in obtaining or communicating the information." *Id.* (quotation omitted).

### a. Negligent Misrepresentation

#### i. Precluded by Minn. Stat. § 604.101

Under Minnesota law, "[a] buyer may not bring a common law misrepresentation claim against a seller relating to the goods sold or leased unless *the misrepresentation was made intentionally or recklessly*." Minn. Stat. § 604.101, subd. 4 (emphasis added). A "buyer" is "a person who buys . . . or contracts to buy . . . the goods that are alleged to be defective or the subject of a misrepresentation." *Id.*, subd. 1(b). A "seller" is "a person who sells . . . or contracts to sell . . . the goods that are alleged to be defective or the subject of a misrepresentation." *Id.*, subd. 1(f). "Goods" are "tangible personal property, regardless of whether that property is incorporated into or becomes a component of some different property." *Id.*, subd. 1(c); *see also* Minn. Stat. § 336.2-105(1) (including nascent animal offspring in the definition of "goods").

In this case, Smith was the buyer and Genesus was the seller. The goods were breeding gilts and boar semen. *See* Minn. Stat. § 604.101, subd. 1(c); *see also, e.g.*, *Lehman v. Am. Breeders Serv., Inc.*, 482 A.2d 700, 706 (Vt. 1984) (written contract in which plaintiff was distributor of defendant's bovine semen was contract for sale of goods); *Lohman v. Wagner*, 862 A.2d 1042, 1046 (Md. App. 2004) (weaner pigs fell within definition of "goods"); *Flanagan v. Consolidated Nutrition*, 627 N.W.2d 573, 579 (Ia. App. 2001) (contract to buy and sell pigs was contract for sale of goods).

Smith's theory of liability on this claim, however, is premised upon *negligence*. *See Williams v. Smith*, 820 N.W.2d 807, 815 (Minn. 2012) (listing the defendant's failure to exercise reasonable care in communicating the information at issue as an element of a negligent-misrepresentation claim). "Because a common-law negligent misrepresentation claim does not require a misrepresentation to be made intentionally or recklessly, such a claim is barred by [Minn. Stat. § 604.101]." *Valspar Refinish, Inc. v. Gaylord's, Inc.*, 764 N.W.2d 359, 370 (Minn. 2009). Accordingly, Smith's proposed negligent-misrepresentation claim fails as a matter of law and therefore is futile.

### ii. No Duty Owed

Further, even if Smith's proposed negligent-misrepresentation claim was not barred by Minn. Stat. § 604.101, Smith has failed to allege that Genesus owed him a duty of care. To succeed on a negligent-misrepresentation claim, "the plaintiff must establish: (1) a duty of care owed by the defendant to the plaintiff; (2) the defendant supplies false information to the plaintiff; (3) justifiable reliance upon the information by the plaintiff; and (4) failure by the defendant to exercise reasonable care in communicating the information. *Williams*, 820 N.W.2d at 815. "[T]he existence of a duty of care is a threshold requirement. Without it, liability cannot attach." *Id.* at 816 (citation omitted). "The question of whether a duty of care exists in a particular relationship is a question of law . . . ." *Id.*

In his proposed Second Amended Complaint, Smith alleges that Genesus supplied false information to him, he reasonably relied on this information, and the representations were false at the time they were made. (Redlined Proposed Second Amended Compl.,

¶¶ 59-64.)  Nowhere does Smith allege, much less state with particularity, that Genesus owed him a duty of care.  Therefore, notwithstanding the statutory bar, Smith's negligent-misrepresentation claim fails as a matter of law.

### b.  Fraudulent Misrepresentation

### i.    Conditions at Genetic Depot: Paragraphs 62(b) and (e)

In Paragraphs 62(b) and (e) of Smith's proposed Second Amended Complaint, Smith alleges that Halbach did not disclose deficiencies in Genetic Depot's operations and represented that Genetic Depot "was competently managed and staffed, adequately tested for PRRS, utilized appropriate bio-security measures, and employed reasonable measures to provide 'PRRS-naïve' semen produced by PRRS naïve boars."

The knowledge or belief of the representer is key in a claim for fraudulent misrepresentation.  *Florenzano v. Olson*, 387 N.W.2d 168, 173 (Minn. 1986).  Nowhere does Smith allege, much less state with particularity, that Halbach made these statements knowing them to be false or without knowledge of their truth or falsity.  *See id.* (fraudulent intent is present when representer knows or believes the matter is not as he stated or when he "speaks positively and without qualification but either is conscious of ignorance of the truth, or realizes that the information on which he . . . relies is not adequate or dependable enough to support such a positive, unqualified assertion").  Smith alleges only that the representations "were untrue and false at the time that they were made," (Redlined Proposed Second Amended Compl., ¶ 64), not that Halbach knew they were false or had some reason to question the representations made.  At the time, Halbach may have very well believed, and had no reason to question, that Genetic Depot

22

was properly managed, maintained adequate biosecurity measures, and provided sufficient testing for PRRS. Smith has not pleaded sufficient facts that Halbach made representations concerning the conditions at Genetic Depot that he either knew to be false or had no knowledge of their truth or falsity and, therefore, these fraudulent misrepresentation claims fail as a matter of law. *See Exeter Bancorporation, Inc. v. Kemper Secs. Grp.*, 58 F.3d 1306, 1314 (8th Cir. 1995) ("That the investor eventually did not materialize is not, by itself, enough to create an inference that the statement was false when made; other evidence is required to show that BEL did not believe, or lacked reason to believe, that the investor was locked up at the time it made the statement. Fraud is not shown simply because an expected occurrence did not occur.").

### ii. Non-Disclosure: Paragraphs 62(a) and (b)

Paragraphs 62(a) and (b) of Smith's proposed Second Amended Complaint allege that Halbach failed to disclose information about the risks associated with this type of enterprise and the deficiencies at Genetic Depot's facility.

"[T]the general rule is that one party to a transaction has no duty to disclose material facts to the other." *Petsche*, 830 F. Supp.2d at 670 (quotation omitted). "Before nondisclosure may constitute fraud[,] there must be a suppression of facts which one party is under a legal or equitable obligation to communicate to the other, and which the other party is entitled to have communicated to him." *Jane Doe 43C v. Diocese of New Ulm*, 787 N.W.2d 680, 687 (Minn. App. 2010) (quotation omitted).

> A party has a duty to disclose in the following circumstances:
> (1) one who speaks must say enough to prevent his words
> from misleading the other party; (2) one who has special

23

> knowledge of material facts to which the other party does not
> have access may have a duty to disclose these facts to the
> other party[; and] (3) one who stands in a confidential or
> fiduciary relation to the other party must disclose material
> facts.

*Block*, 795 F. Supp. 2d at 890.

As Genesus points out, nowhere does Smith allege that Halbach, and therefore Genesus, had a duty to disclose information to him. (Mem. in Opp'n at 16.) As previously stated, there is nothing to indicate that Halbach knew about any deficiencies at Genetic Depot's facility. There is nothing to indicate that Halbach had special knowledge about the risk of disease. Likewise, Smith has not alleged that there was some sort of special relationship between himself and Genesus. This Court concludes that Smith has not pleaded sufficient facts to show that Genesus had a duty to disclose information to him and, accordingly, these claims for fraudulent misrepresentation fail as a matter of law.

### iii.    Genesus's Expertise: Paragraph 62(c)

Closely related to the nondisclosure allegations is Smith's allegation that Genesus misrepresented itself as an expert in the field. In Paragraph 62(c) of the proposed Second Amended Complaint, Smith alleges that Halbach represented that Genesus was an "expert in managing this kind of multiplier herd hog production enterprise and that [Genesus's] expertise included proper selection of virus-free sources for semen used in the enterprise." Representations concerning Genesus's expertise were made in the context of a sales negotiation. There is nothing to indicate that Genesus was acting as Smith's advisor or confidant or any sort of objective measure of Genesus's purported

expertise. Without more, such statements amount to puffery, "statements that are either exaggerated boasting or vague, subjective statements of superiority." *Moua v. Jani-King of Minn., Inc.*, No. 08-cv-4942 (ADM/TNL), 810 F. Supp. 2d 882, 890 (D. Minn. 2011). "Regardless of education or experience, consumers expect to hear some level of nonspecific and optimistic references to a products quality by its seller." *Id.* at 891. "[B]ecause fraud requires a misrepresentation concerning a past or present material fact susceptible of knowledge, statements of prediction, opinion, or 'puffery' cannot form the basis of a fraud claim." *Id.* at 890.

### iv. Earning Potential: Paragraph 62(d)

The last misrepresentation alleged by Smith is the ability to "earn profits as established in the written proposal offered to [Smith] by [Genesus], through [Halbach]." (Redlined Proposed Second Amended Compl., ¶ 62(d).) The written proposal is a series of five scenarios, comparing farrow-to-finish profitability for multiplication and commercial hog operations. (*See* Redlined Proposed Second Amended Compl., Ex. B.)

"Under Minnesota law, false promises or projections of profits can be the basis of a fraud action, but only if they are false representations of a past or present material fact." *Trooien*, 608 F.3d at 1029 (quotation omitted). The proposal contains no explanatory language or disclaimers suggesting, for example, that it is only an estimate or hypothetical projection, other than what a person might read into the fact that the document's title contains the word "proposal." *Cf. id.* at 1031 (disclaimers supported conclusion that revenue projections were not made with knowledge that they were false

or misleading or made without reasonable care).  The absence of such language arguably supports Smith's allegation that the proposal guaranteed a certain amount of profits.

But unless the allegedly false promises or projections of profits contain false representations of a past or present material fact, "expected profits are irrelevant to misrepresentation claims because expected profits are not recoverable damages in Minnesota for fraud." *Crowell v. Campbell Soup Co.*, 264 F.3d 756, 767 (8th Cir. 2001). In *Crowell*, farmers alleged that they were induced to enter broiler-chicken-production agreements based, in part, on the supplier's promises of certain profit projections.  *Id.* at 760.  When the supplier terminated the contracts, the farmers alleged, among other things, that the supplier misrepresented the expenses and profits under the contracts.  *Id.* at 764.  Noting that "[t]he written pro forma statements, which contained various financial projections for raising broiler chickens in poultry buildings, . . . . appear to be nothing more than future projections," the Eighth Circuit pointed out that the farmers never alleged that these statements "contained any specific misrepresentations of a past or present material fact."  *Id.*  Smith's proposed Second Amended Complaint suffers from the same deficiency—Smith has not identified any specific past or present material fact that Halbach allegedly misrepresented when preparing the proposal.  Because Smith has not alleged that Halbach misrepresented a specific past or present material fact in the proposal, this claim fails as a matter of law.

**III.**

Based on the foregoing, and all the files, memoranda, and proceedings herein, **IT IS HEREBY ORDERED** that Plaintiff Myron Smith's Motion for Leave to Amend Complaint (Docket No. 38) is **GRANTED IN PART** with respect to the updated references and additional factual allegations and **DENIED IN PART** with respect to the proposed claims.


Date: February  20  , 2013                                   *s/ Tony N. Leung*
                                                              Tony N. Leung
                                                              United States Magistrate Judge
                                                              for the District of Minnesota

                                                              *Smith v. Genetic Depot, Inc.*
                                                              File No. 11-cv-273 (PJS/TNL)